UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WCT INC.,<br><br>        Plaintiff,<br><br>v.<br><br>REPUBLIC OF INDIA, THE EMBASSY OF INDIA WASHINGTON, D.C., AND MINISTRY OF EXTERNAL AFFAIRS THROUGH THE EMBASSY OF INDIA, WASHINGTON, D.C.,<br><br>        Defendants.<br><br>STATE BANK OF INDIA,<br>NEW YORK BRANCH,<br><br>        Nominal Defendant. | No. 22-cv-6340 |

## DECLARATION OF SONIA BOVEJA IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**SONIA BOVEJA**, pursuant to 28 U.S.C. § 1746, of full age, declares as follows:

1. I am the president of the Plaintiff WCT Inc. ("Plaintiff" or "WCT"). I submit this Declaration in support of Plaintiff's Motion for a Temporary Restraining Order ("TRO") and a Preliminary Injunction. Unless where indicated otherwise, I base my Declaration upon personal knowledge or a review of pertinent documents.

2. WCT is a Florida corporation with its principal place of business located at 2711 South Ocean Drive, Unit 405L, Hollywood, Florida 33019.

29159802v.3

3. WCT's affiliate, Word Compliance Technologies Pvt. Ltd., ("WCT India") is a company duly registered in India, which specializes in the area of security, compliance, and risk management products and solutions for corporations and governments.

4. In late 2019, WCT India was approached by Cox & Kings Global Services Pvt. Ltd. ("CKGS"), another Indian corporation, and was asked to provide financial and operational support for certain outsourcing contracts CKGS had with the Embassy of India at Washington, D.C. (the "Embassy"), and Ministry of External Affairs through the Embassy of India (the "Ministry") both part of the Republic of India (each, individually a "Defendant" and collectively the "Defendants"). Specifically, CKGS explained that it had entered into two separate binding contractual agreements (which were subsequently extended several times) with the Ministry and the Embassy (collectively, the "Authorities") to provide outsourcing services. Those contracts were up for renewal and CKGS was seeking assistance in connection with this renewal.

A. **The Outsourcing Contracts.**

5. CKGS had first entered into a contract with the Authorities on April 29, 2014, pursuant to which the Authorities were to outsource services related to the issuance and operation of Visas, Overseas Citizenship of India Cards, Person of Indian Origin Cards, Renunciation and Surrender of Indian Nationality and Citizenship, and other Certificate Support Services (collectively the "Outsourcing Services"). Pursuant to the terms of this contract, CKGS was to act as a service provider to the Authorities (the "Initial Outsourcing Contract"). A true and correct copy of the Initial Outsourcing Contract is attached as **Exhibit A**.

6. The term of the Initial Outsourcing Contract commenced on May 21, 2014 and was to end on May 20, 2018, but it was subsequently extended through a series of extension agreements (collectively "Extension Agreements"). These Extension Agreements were entered on September

24, 2018, March 27, 2019, and December 31, 2019. A true and correct copy of the December 31, 2019 Extension Agreement is attached as **Exhibit B**.

    7. The Extension Agreements expressly required CKGS to arrange for bank guarantees:

> (i) submitting fresh Bank Guarantees (BGs) valid from 1st January 2020 until 30th June 2022, within one month of signing of this Extension Agreement on the basis of number of services in the last 3 years (2017-2019), failing which the Ministry shall have the right to terminate the Agreement so extended and CKGS shall be liable for all the consequences arising therefore…..

    8. On April 19, 2016, CKGS entered into a second outsourcing contract with the Authorities (the "Passport Contract") pursuant to which CKGS was to act as a service provider to the Authorities with respect to certain passport services. (The Passport Contract and the Initial Outsourcing Contract, collectively are the "Outsourcing Contracts"). A true and correct copy of the Passport Contract is attached as **Exhibit C**.

    9. The term of the Passport Contract commenced on April 19, 2016 and was to end on May 6, 2018, but it was also subsequently extended through a series of extension agreements entered on September 24, 2018, March 27, 2019, and December 31, 2019 (collectively "Passport Extension Agreements"). A true and correct copy of the December 31, 2019 Passport Extension Agreement is attached as **Exhibit D**.

    10. The Passport Extension Agreements likewise expressly required CKGS to arrange for bank guarantees:

> (i) submitting fresh Bank Guarantees (BGs) valid from 1st January 2020 until 30th June 2022, within one month of signing of this Extension Agreement on the basis of number of services in the last 3 years (2017-2019), failing which the Ministry shall have the right to terminate the Agreement so extended and CKGS shall be liable for all the consequences arising therefore…..

    11. CKGS had previously arranged for bank guarantees in accordance with the terms of the Outsourcing Contracts. However, the December 31, 2019 Extension Agreements and the

29159802v.3

Passport Extension Agreements required CKGS to provide "fresh bank guarantees" that would be valid until June 30, 2022.

### B. The Assignment and Consent Agreement.

12. CKGS relayed to WCT India and WCT that, when the Outsourcing Contracts were up for renewal in 2019, it was facing financial hardship that prevented it from further extending the Outsourcing Contracts due in part to its inability to provide fresh bank guarantees.

13. CKGS thus undertook efforts to recruit WCT to step in and act as that third party to fund a series of bank guarantees to the Authorities and to have WCT India step in to provide operational support for the Outsourcing Contracts. In turn, CKGS would assign the Outsourcing Contracts to WCT India.

14. CKGS specifically represented to WCT that it had fully informed the Authorities of its financial hardship and that the Authorities understood that an investor or third party would need to become involved to help resolve the situation. In addition, CKGS told WCT that the Authorities had consented to the assignment of the Outsourcing Contracts to WCT India, as long as the fresh bank guarantees were provided.

15. In January 2020, CKGS executed an assignment and consent agreement ("Assignment and Consent Agreement") with WCT India. A true and correct copy of the Assignment and Consent Agreement is attached hereto as **Exhibit E**. The Assignment and Consent Agreement outlined the terms and timeline for the Outsourcing Contracts to be fully transferred and assigned to WCT India.

16. As consideration for the assignment of the Outsourcing Contracts, WCT India agreed to pay a monthly fee to CKGS and arrange for the requisite bank guarantees on behalf of CKGS.

17. By the terms of the Assignment and Consent Agreement, once WCT India arranged for the fresh bank guarantees to be provided, it would retain exclusive rights to work product, contracts, and information as it related to the Outsourcing Contracts with the Authorities.

18. The validity of the Assignment and Consent Agreement was contingent upon the Authorities approving the assignment of the Outsourcing Contracts by or before the pre-closing date (the "Pre-Closing Date") set forth in the agreement.

19. Section 7.1 and section 7.2 of the Assignment and Consent Agreement state:

> 7.1 Pre-Closing Date shall be on or before the expiration of this Agreement by which time CKGS shall obtain in principle written approval of the Processing Agreements and Processing Services in favour of WCT from the Authorities. Simultaneously, with such approval being provided by CKGS to WCT, WCT shall deliver the Bank Guarantee(s) as detailed in Exhibit 3 to the Authorities.
>
> 7.2 Closing shall occur 10 (ten) business days after all deliverables under this Agreement are delivered and accepted by WCT and the satisfactory complete Assignment of the Processing Agreements and the relevant Authorities accepting the Bank Guarantee provided by WCT. During the period until Closing date CKGS undertakes full responsibility to successfully run Processing Services as required under the Processing Agreements including making payments when they come due in the ordinary course of business to Vendors and all employees.

20. The plan of the parties was that, upon approval of the assignment of the Outsourcing Contracts to WCT India by the Authorities, the bank guarantees would be provided to the Authorities by WCT.

21. As the parties agreed and as outlined in the Assignment and Consent Agreement, the bank guarantees would only be valid if the Outsourcing Contracts were assigned to WCT India. Otherwise, as per the terms of the Agreement, the bank guarantees would be rendered null and void.

22. Section 2.3 of the Assignment and Consent Agreement expressly stated that:

> If for whatever reason, if any act, action, claim, dispute, difference, liability, etc. from a court of law or a third party or a claim of any nature whatsoever that may arise on account of any misrepresentation and/or non-disclosure by the CKGS

Companies or for any reason whatsoever (other than non-performance by WCT) result in **premature termination of the Processing Agreements, the Bank guarantee provided to the Authorities will be null and void.** (Emphasis added).

23. CKGS re-confirmed its prior representation that the Authorities had consented to the assignment, that it had made the Authorities aware of WCT India's involvement and of the Assignment and Consent Agreement, and that a third party would be providing the requisite bank guarantees.

C. **The January 24 Letter.**

24. A few days after the execution of the Assignment and Consent Agreement, CKGS sent a letter to the Ministry, which specifically memorialized the discussions CKGS claimed it had had with the Authorities about WCT Indi's involvement in the Outsourcing Contracts and requisite guarantees (the "January 24 Letter") The January 24 Letter further confirmed the Authorities' approval of the assignment of the Outsourcing Contracts (the "January 24 Letter"). However, unbeknownst to WCT India, the Authorities had outright rejected the idea of WTC India providing any said services or bank guarantees.

25. On January 24, 2020, the Ministry acknowledged receipt of the January 24 Letter, which set forth the following terms:

> We Cox and Kings Global Services here states that our Bank Guarantee for all the mission has been arranged and we have got the investor who will be helping us in terms of Finance and operations for all the Mission projects.
>
> Addition to this Bank is asking for Assignment approval as per the Clause 10 (Page No. 15 and 16) of the Master service agreement.
>
> Our new Investor partner is World Compliance Technology (WCT), WCT Pvt Ltd., a company incorporated in India with its registered address at 1027-1030 Tower B3, Spaze i-Tech park, Sector 49, Sohna Road, Gurgaon, India.
>
> WCT will be furnishing the BG on behalf of CKGS and will be supporting us in running the operation for a period of 2 (TWO) years effective from 1st Jan, 2020 till 31st Dec, 2021.

> Hence request you to please grant your consent to allow WCT to furnish the BG on our behalf and partner us in running the operation.
>
> CKGS will be full responsible for adhering to RFP terms and clauses. There will be no deviation in any of the compliance and process.

26. Based on its conversations with CKGS, it was WCT's understanding that in accordance with the terms set forth in the January 24 Letter, WCT was to provide the requisite bank guarantees and in exchange the Outsourcing Contracts would be assigned to WCT India. A true and correct copy of the January 24 Letter, with the Ministry's acknowledgement of receipt, is attached hereto as **Exhibit F**.

D. **The Bank Guarantees.**

27. In accordance with the Outsourcing Contracts, and the Assignment and Consent Agreement, WCT, at the behest of WCT India, arranged for the requisite bank guarantees. WCT posted collateral ("Collateral") and provided the financing for the funding of four bank guarantees (collectively the "WCT Guarantees") to be issued on February 28, 2020 and March 10, 2020.

28. The WCT Guarantees were issued as follows:

| Bank Guarantee | Date Issued | Amount | Bank |
|---|---|---|---|
| 1 | March 10, 2020 | $443,304 | SBI |
| 2 | March 10, 2020 | $774,304 | SBI |
| 3 | March 10, 2020 | $2,751,467 | SBI |
| 4 | February 28, 2020 | $565,000 | ICICI Bank |
| Total: | | $4,534,075 | |

29. The amounts of the separate WCT Guarantees were determined by the Authorities to reflect the services that were provided by CKGS to the Embassy during the preceding three years from 2017 to 2019.

30. Three of the bank guarantees (individually "SBI Guarantee" and collectively the "SBI Guarantees") were issued by the State Bank of India ("SBI"). The SBI Guarantees totaled $3,970,304.00. True and correct copies of the SBI Guarantees are attached hereto as **Exhibit G**.

31. Each one of the WCT Guarantees only guaranteed performance of specific obligations relating to the Outsourcing Contracts.

32. The $443,304 SBI Guarantee guaranteed "the government funds collected and held…temporarily and for the safety of documents."

33. The $774,304 SBI Guarantee guaranteed payment of penalties associated with non-compliance with service standards as per the Outsourcing Contracts.

34. The $2,751,467 SBI Guarantee and the $565,000 guarantee with ICICI Bank guaranteed payments of those amounts if the contractor terminated the Outsourcing Contracts without providing the contractually mandated six month notice. That was the only circumstance under which the Authorities could draw on those guarantees.

35. WCT worked with SBI and provided the Collateral to secure and fund the SBI Guarantees. After WCT provided the Collateral and cooperated fully with SBI, SBI informed WCT that the SBI Guarantees would be issued. Without WCT's consent or any notice to WCT, SBI sent the SBI Guarantees directly to the Embassy on March 10, 2020.

E. **The Termination/Non-Renewal of the Outsourcing Contracts.**

36. Apparently, the Ministry had sent CKGS a letter dated January 29, 2020 wherein the Ministry stated that it would not accept third-party guarantees in connection with the Outsourcing Contract (the "January 29 Letter"). The January 29 Letter was not provided to WCT, which only became aware of it recently. A copy of the January 29 Letter is attached as **Exhibit H**.

37. It came to WCT's attention, after the fact, that there were also a series of letters dated March 5, 2020 through March 18, 2020, between CKGS and the Authorities. In those letters, the

Authorities conveyed to CKGS that they are rejecting the WCT Guarantees and to terminating the Outsourcing Contracts because the bank guarantees were being provided by WCT. The Authorities, thereby also rejected Assignment and Consent Agreement. True and collect copies of the letters are attached as Exhibit I.

38. On March 10, 2020, in the midst of this correspondence, the SBI Guarantees were sent by SBI directly to the Embassy. This was after their receipt of the SBI Guarantees that the Authorities proceeded only to terminate the Outsourcing Contracts, but also effectively extinguish the Assignment and Consent Agreement.

39. Based on the terms of the Agreement, upon termination/non-renewal of the Outsourcing Contracts, the Assignment and Consent Agreement became null and void, and so did the SBI Guarantees. Thus, the SBI Guarantees should be of no effect. However, despite this fact, and even though the Authorities terminated and refused to renew the Outsourcing Contracts with CKGS because of purportedly the guarantees were provided by a third party, they have refused to return the SBI Guarantees to WCT or to release its Collateral.

40. WCT has also discovered that the Defendants conducted an audit of CKGS's past performance which, Defendants contend, revealed that several million dollars are owed by CKGS to Defendants. Defendants have indicated that they plan to use the SBI Guarantees and underlying Collateral to pay certain of the amounts allegedly owed by CKGS to Defendants. This is despite the fact that each of the SBI Guarantees, by its terms, may only be drawn on in the event of a specific breach of the Outsourcing Contract identified therein.

41. At the same time, it has come to WCT's attention that CKGS is no longer a going concern but rather is insolvent, and unable to satisfy the amount that it apparently owes to the Authorities as per the audit.

42.     The termination of the Outsourcing Contract has led to litigation between CKGS and Defendants in India.  WCT India has also brought certain claims in India.  WCT is not a party to those proceedings; nor is SBI  It appears the primary issues involved in those proceedings relate to the termination of the Outsourcing Contracts and also disputes around the audit conducted by the Authorities of CKGS's performance under the Outsourcing Contracts.  To date, the Indian court has not addressed any substantive issues regarding the SBI Guarantees.

43.     In response to Defendants' threats to draw on the SBI Guarantees, WCT agreed to extend the term of the SBI Guarantees by three months, to September 22, 2022.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: July ___, 2022

_____
Sonia Boveja