UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WCT INC., <br><br> Plaintiff, <br><br> v. <br><br> REPUBLIC OF INDIA, THE EMBASSY OF INDIA WASHINGTON, D.C., AND MINISTRY OF EXTERNAL AFFAIRS THROUGH THE EMBASSY OF INDIA, WASHINGTON, D.C., <br><br> Defendants. <br><br> STATE BANK OF INDIA, NEW YORK BRANCH, <br><br> Nominal Defendant. | Civ. No. <br><br><br> **COMPLAINT** |

Plaintiff, WCT Inc. ("WCT" or "Plaintiff"), by its undersigned attorneys, White and Williams LLP, as and for its Complaint against Defendants, the Republic of India ("India" or the "ROI"), the Embassy of India at Washington, D.C. (the "Embassy"), Ministry of External Affairs through the Embassy of India (the "Ministry") (each, individually a "Defendant" and collectively the "Defendants"), and Nominal Defendant State Bank of India, New York Branch ("SBI"), alleges as follows:

## INTRODUCTION

1. By this action, Plaintiff seeks to recover from Defendants amounts that Plaintiff posted as collateral (the "Collateral") to support certain guarantees that were provided to Defendants in connection with outsourcing contracts to provide certain services to the Embassy,

which were originally entered between the Ministry and a third-party service provider. While Defendants specifically rejected the guarantees provided by the Plaintiff, and terminated the contracts, they nevertheless have refused to return the guarantees or release the Collateral, but instead have actually indicated their intention to retain these amounts to pay unrelated obligations of a party other than Plaintiff. Defendants' actions have thereby caused significant harm to Plaintiff. Plaintiff seeks to compel the return of the guarantees and release of its Collateral and to recover damages from Defendants, and also seeks injunctive relief preventing any effort to collect against the Collateral during the pendency of this action.

2. On April 29, 2014 and April 19, 2016, the Ministry and the Embassy entered into two separate binding contractual agreements with M/s Cos & Kings Global Services PVT. Ltd., an Indian corporation ("CKGS"), whereby CKGS would provide certain outsourced services to Defendants. The Outsourcing Contracts (as defined below) were each later extended several times.

3. CKGS subsequently assigned the Outsourcing Contracts through an Assignment and Consent Agreement to World Compliance Technologies Pvt. Ltd. ("WCT India"), an affiliate of WCT. CKGS told WCT India that Defendants consented to this assignment.

4. In connection with the assignment of the Outsourcing Contracts to WCT India, Plaintiff WCT collateralized and funded a series of bank guarantees, solely and specifically to support the Outsourcing Contracts. By their terms, these guarantees were intended to protect the Ministry in the event that specific provisions of the Outsourcing Contracts were breached. However, upon receipt of the guarantees, Defendants almost immediately refused to renew, and instead terminated, the Outsourcing Contracts. Defendants' stated reason for this termination was that they were unwilling to accept the guarantees and collateral provided by a non-party to the Outsourcing Contracts.

5.     Despite Defendants' rejection of the guarantees from WCT and failure to continue with the Outsourcing Contracts, Defendants also have refused to return the guarantees to the Plaintiff or to release the Collateral. The Defendants have also rejected the Assignment and Consent Agreement.  As a result, WCT not only has been deprived of access to the substantial amounts that were posted as Collateral solely for the purpose of supporting the Outsourcing Contracts, but also has suffered significant additional damages. These include interest, fees, and other amounts WCT has had to pay in connection with posting the Collateral, and securing and later extending the guarantees, in an amount of over $600,000.  WCT has also lost profits and opportunities that it could and should have captured but for Defendants' wrongdoing, in an amount of over $2,000,000.  By this action, WCT seeks to recover its Collateral, to be compensated for these damages, and to obtain injunctive relief to prevent potential irreparable harm.

## THE PARTIES

6.     Plaintiff WCT Inc. is a Florida corporation with its principal place of business located at 2711 South Ocean Drive, Unit 405L, Hollywood, Florida 33019.

7.     Defendant Republic of India is a country in South Asia. India is a foreign state within the meaning of 28 U.S.C. § 1603(a).

8.     Defendant the Embassy of India of Washington D.C. is the embassy of the ROI in the United States.  It has an address of 2107 Massachusetts Avenue, NW, Washington DC 20008.

9.     Defendant Ministry of External Affairs is a government agency of the ROI responsible for implementing foreign policy.

10.    Nominal Defendant the State Bank of India, New York Branch is a New York State licensed banking institution with a New York branch with its principal place of business located at 460 Park Avenue, New York, New York 10022.

## JURISDICTION AND VENUE

11. The Court has subject matter jurisdiction over this action under the Foreign Sovereign Immunities Act (the "FSIA"). Specifically, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1330(a), which provides that the United States District Courts shall have original jurisdiction "of any nonjury civil action against a foreign state," as defined in 28 U.S.C. § 1603, unless the foreign state is entitled to immunity under 28 U.S.C. §§ 1605-1607 or an applicable international agreement.

12. India is a "foreign state" within the meaning of 28 U.S.C. § 1603(a). The FSIA's "commercial activity" exception denies immunity to a foreign state where an action is "based upon" any of the following: (i) "a commercial activity carried on in the United States by the foreign state"[1]; (ii) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (iii) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

13. Under the "commercial activity" exception, India, the Ministry and the Embassy are not immune from suit, given that this action is based upon a commercial activity carried on in the United States by a foreign state; an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere, that caused a direct effect in the United States.

---

[1] The FSIA defines the phrase "commercial activity carried on in the United States by a foreign state" as "commercial activity carried on by such state and having *substantial contact with* the United States." 28 U.S.C. § 1603(e).

14. This Court has personal jurisdiction over India, the Embassy and the Ministry, pursuant to 28 U.S.C. § 1330(b), which provides that a United States District Court shall have personal jurisdiction over a foreign state that is not immune from suit, provided that service is effected in accordance with 28 U.S.C. § 1608.

15. Because India, the Ministry and the Embassy are a foreign state, they are not entitled to due process under the Fifth Amendment and therefore cannot assert a "minimum contacts" defense to jurisdiction.

16. Venue is proper in this Court under 28 U.S.C. § 1391(f)(1) because the Defendants entered into contractual obligations stemming from various bank guarantees that were issued in this District by a New York banking institution.

17. The commercial activity related to the banking guarantees that gave rise to the dispute occurred in New York.

## FACTUAL BACKGROUND

### A. The Outsourcing Contracts.

18. Upon information and belief, the Embassy and Ministry (collectively, the "Authorities") have entered into various contracts to outsource services related to the issuance and operation of Visas, Overseas Citizenship of India Cards, Person of Indian Origin Cards, Renunciation and Surrender of Indian Nationality and Citizenship, and other Certificate Support Services (collectively the "Outsourcing Services").

19. Upon information and belief, on April 29, 2014, a representative of the Ministry, through the Embassy, executed an outsourcing contract between the Embassy and CKGS, an Indian corporation, pursuant to which CKGS was to act as a service provider to the Authorities (the "Initial Outsourcing Contract").

20. The term of the Initial Outsourcing Contract commenced on May 21, 2014, and was to end on May 20, 2018, but was subsequently extended through a series of extension agreements (collectively "Extension Agreements").

21. Extension Agreements were entered on September 24, 2018, March 27, 2019, and December 31, 2019.

22. The Extension Agreements expressly required CKGS to arrange for the provision of bank guarantees:

> (i) submitting fresh Bank Guarantees (BGs) valid from 1st January 2020 until 30th June 2022, within one month of signing of this Extension Agreement on the basis of number of services in the last 3 years (2017-2019), failing which the Ministry shall have the right to terminate the Agreement so extended and CKGS shall be liable for all the consequences arising therefore…..

23. Upon information and belief, on April 19, 2016, a representative of the Ministry, through the Embassy, executed a second outsourcing contract (the "Passport Contract") between the Embassy and CKGS pursuant to which CKGS was to act as a service provider to the Authorities with respect to certain passport services. (The Passport Contract and the Initial Outsourcing Contract, collectively are the "Outsourcing Contracts")

24. The term of the Passport Contract commenced on April 19, 2016 and was to end on May 6, 2018 but was subsequently extended through a series of extension agreements (collectively "Passport Extension Agreements").

25. Passport Extension Agreements were entered on September 24, 2018, March 27, 2019, and December 31, 2019 (the "Passport Extension Agreements").

26. The Passport Extension Agreements (similar to the Extension Agreements) expressly required CKGS to arrange for the provision of bank guarantees:

> (i) submitting fresh Bank Guarantees (BGs) valid from 1st January

2020 until 30th June 2022, within one month of signing of this Extension Agreement on the basis of number of services in the last 3 years (2017-2019), failing which the Ministry shall have the right to terminate the Agreement so extended and CKGS shall be liable for all the consequences arising therefore…..

27. Upon information and belief, CKGS had previously arranged for bank guarantees in accordance with the terms of the Outsourcing Contracts, but in accordance with the Extension Agreements and the Passport Extension Agreements, CKGS was obligated to provide "fresh bank guarantees" that would be valid until June 30, 2022.

28. Upon information and belief, at the time when the Outsourcing Contracts were up for renewal in 2018, CKGS was facing financial hardship that prevented it from further extending the Outsourcing Contracts due in part to its inability to provide fresh bank guarantees.

**B.     The Assignment and Consent Agreement.**

29. Upon information and belief, in late 2019, CKGS approached Plaintiff and its affiliates to gain financial and operational support for the Outsourcing Contracts. This included asking for assistance with furnishing a series of bank guarantees to support the renewal requirements.

30. In or about January 2020, CKGS executed an assignment and consent agreement ("Assignment and Consent Agreement") with WCT India.

31. The Assignment and Consent Agreement outlined the terms and timeline for the Outsourcing Contracts to be fully transferred and assigned to WCT India.

32. CKGS represented to WCT and WCT India that the Authorities had been made aware of CKGS's financial difficulties and need for operational and financial support, and consented to the assignment of the Outsourcing Contracts to WCT India and the provision of guarantees by WCT.

33. In exchange for the assignment by CKGS of the Outsourcing Contracts to WCT India, among other things, WCT India would pay a monthly fee to CKGS, and arrange for the needed bank guarantees to be issued on behalf of CKGS.

34. Once WCT India arranged for the fresh bank guarantees to be provided, it would retain exclusive rights to work product, contracts, and information as it related to the Outsourcing Contracts with the Authorities.

35. The validity of the Assignment and Consent Agreement was contingent upon the Authorities approving the assignment of the Outsourcing Contracts by or before the pre-closing date set forth therein (the "Pre-Closing Date").

36. As set forth in section 7.1 and section 7.2 of the Assignment and Consent Agreement:

> 7.1 Pre-Closing Date shall be on or before the expiration of this Agreement by which time CKGS shall obtain in principle written approval of the Processing Agreements and Processing Services in favour of WCT from the Authorities. Simultaneously, with such approval being provided by CKGS to WCT, WCT shall deliver the Bank Guarantee(s) as detailed in Exhibit 3 to the Authorities.
>
> 7.2 Closing shall occur 10 (ten) business days after all deliverables under this Agreement are delivered and accepted by WCT and the satisfactory complete Assignment of the Processing Agreements and the relevant Authorities accepting the Bank Guarantee provide by WCT. During the period until Closing date CKGS undertakes full responsibility to successfully run Processing Services as required under the Processing Agreements including making payments when they come due in the ordinary course of business to Vendors and all employees.

37. Upon approval of the assignment of the Outsourcing Contracts to WCT India by the Authorities, the bank guarantees would formally be provided to the Authorities by WCT.

38. Significantly, the bank guarantees would only be valid if the Outsourcing Contracts were assigned to WCT India; otherwise, the bank guarantees would be rendered null and void. Section 2.3 of the Assignment and Consent Agreement expressly stated that:

> If for whatever reason, if any act, action, claim, dispute, difference, liability, etc. from a court of law or a third party or a claim of any nature whatsoever that may arise on account of any misrepresentation and/or non-disclosure by the CKGS Companies or for any reason whatsoever (other than non-performance by WCT) result in **premature termination of the Processing Agreements, the Bank guarantee provided to the Authorities will be null and void.**

### C. The January 24 Letter.

39. Upon information and belief, a few days after the execution of the Assignment and Consent Agreement, CKGS sent a letter to the Ministry, which specifically memorialized the discussions CKGS claimed it had had with the Authorities about WCT India's involvement in the Outsourcing Contracts and procuring the requisite guarantees (the "January 24 Letter"). The January 24 Letter confirmed the Authorities' purported approval of the assignment of the Outsourcing Contracts. However, unbeknownst to WCT India, the Authorities had outright rejected the idea of WCT India providing any said services or bank guarantees.

40. Upon information and belief, on or about January 24, 2020, the Ministry expressly acknowledged receipt of the January 24 Letter. The January 24 Letter memorialized the following terms:

> We Cox and Kings Global Services here states that our Bank Guarantee for all the mission has been arranged and we have got the investor who will be helping us in terms of Finance and operations for all the Mission projects.
>
> Addition to this Bank is asking for Assignment approval as per the Clause 10 (Page No. 15 and 16) of the Master service agreement.
>
> Our new Investor partner is World Compliance Technology (WCT), WCT Pvt Ltd., a company incorporated in India with its registered address at 1027-1030 Tower B3, Spaze i-Tech park, Sector 49, Sohna Road, Gurgaon, India.
>
> WCT will be furnishing the BG on behalf of CKGS and will be supporting us in running the operation for a period of 2 (TWO) years effective from 1st Jan, 2020 till 31st Dec, 2021.
>
> Hence request you to please grant your consent to allow WCT to furnish the BG on our behalf and partner us in running the operation.

CKGS will be full responsible for adhering to RFP terms and clauses. There will be no deviation in any of the compliance and process.

41. Thus, the requisite bank guarantees would be provided in accordance with the terms of the Outsourcing Contracts and the Assignment and Consent Agreement, solely for purposes of supporting the Outsourcing Contract, and protecting the Ministry in the event of specific breaches of the same.

42. The July 24 Letter was executed by the CEO of CKGS and acknowledged by the CPV Division of the Ministry.

**D.    The Bank Guarantees.**

43. In accordance with the Outsourcing Contracts and the Assignment and Consent Agreement, WCT, at the behest of its affiliate, WCT India, arranged for the requisite bank guarantees to be issued on February 28, 2020 and March 10, 2020.

44. WCT provided the financing and Collateral and arranged for four bank guarantees (collectively the "WCT Bank Guarantees") to be issued in conjunction with the Outsourcing Contract, Assignment and Consent Agreement, and the Letter Agreement as follows:

| Bank Guarantee | Date Issued | Amount | Bank |
| --- | --- | --- | --- |
| 1 | March 10, 2020 | $443,304 | SBI |
| 2 | March 10, 2020 | $774,304 | SBI |
| 3 | March 10, 2020 | $2,751,467 | SBI |
| 4 | February 28, 2020 | $565,000 | ICICI Bank |
| Total: | | $4,534,075 | |

45. The amounts of the separate WCT Bank Guarantees were determined by the Authorities to reflect the services that were provided by CKGS to the Embassy during the preceding three years from 2017 to 2019.

46. Three of the bank guarantees were issued by SBI and are directly at issue in this action (individually "SBI Bank Guarantee" and collectively the "SBI Bank Guarantees"), and totaled $3,970,304.00.

47. Each of the WCT Guarantees guaranteed performance of specific obligations relating to the Outsourcing Contracts.

48. The $443,304 guarantee guaranteed "the government funds collected and held…temporarily and for the safety of documents."

49. The $774,304 guarantee guaranteed payment of penalties associated with non-compliance with service standards as per the Outsourcing Contracts.

50. The $2,751,467 and $565,000 guarantees guaranteed payments of these amounts if the contractor terminated the Outsourcing Contracts without providing the contractually mandated six-month notice.

51. After WCT arranged for the Collateral to secure and fund the SBI Guarantees, the SBI Guarantees were issued. Thereafter, without the consent of WCT or even providing notice to WCT, SBI sent the SBI Bank Guarantees directly to the Embassy.

E. **The Termination of the Outsourcing Contracts.**

52. Upon information and belief, in a letter to CKGS dated January 29, 2020, the Ministry indicated that it would not accept third-party guarantees and raised questions about the assignment of the Outsourcing Contracts. This letter was not provided to WCT.

53. Upon information and belief, in a series of letters dated March 5, 2020 through March 18, 2020, and unbeknownst to WCT, the Authorities conveyed to CKGS that they were

rejecting the WCT Guarantees, and terminating the Outsourcing Contracts because the bank guarantees were being provided by WCT. They also indicated that they were rejecting the Assignment and Consent Agreement.

54. Upon information and belief, once the Authorities received the SBI Guarantees, they almost immediately made their intention to terminate/non-renew the Outsourcing Contracts known to CKGS.

55. Thus, after securing the Bank Guarantees, the Authorities proceeded not only to terminate the Outsourcing Contracts, but also effectively extinguish the Assignment and Consent Agreement.

56. Upon termination/non-renewal of the Outsourcing Contracts, the Assignment and Consent Agreement became null and void by its terms, as did the SBI Guarantees.

57. Even though the Authorities rejected the SBI Guarantees, and terminated and refused to renew the Outsourcing Contracts with CKGS purportedly because guarantees had been provided by a third party, they have refused to return the SBI Guarantees to WCT or to release the Collateral.

58. The Defendants have indicated that an audit of CKGS's past performance revealed that several million dollars are owed by CKGS to Defendants. Defendants have also indicated that they may use the Collateral underlying the SBI Guarantees – which were collateralized by WCT and issued solely to support the now-terminated Outsourcing Contracts – to pay certain of these amounts. This is despite the fact that each of the SBI Guarantees, by its express terms, only allows the Authorities to draw on it in the event that specific obligations under the Outsourcing Agreements are breached.

59. As a result, and despite refusing to continue with the Outsourcing Contracts or to permit the Assignment and Consent Agreement to take effect, the Authorities have not released the Collateral or returned the SBI Guarantees.

60. Upon information and belief, CKGS is itself insolvent and no longer a going concern and, if the Collateral were used by Defendants to satisfy obligations of CKGS, WCT would likely not have any viable direct recourse against CKGS.

61. WCT has incurred substantial costs and fees in connection with posting the Collateral and the issuance and maintenance of the SBI Guarantees. This includes interest it is paying on the amounts that it posted as Collateral and cannot access, and various other fees and costs associated with posting the Collateral and securing and later extending the SBI Guarantees, all of which amounts to more than $600,000.

62. In addition, WCT has suffered, and continues to suffer, significant additional damages and harm as a result of Defendants' refusal to return the SBI Guarantees or release the Collateral. This includes lost profits and lost opportunities as a result of the refusal of the Authorities to return the SBI Guarantees and release the Collateral, thereby allowing WCT to use these funds for other corporate purposes. The amount of these damages is in excess of $2,000,000.

**COUNT I**
**(Unjust Enrichment – Against the Authorities)**

63. Plaintiff WCT repeats, reiterates, and realleges each and every allegation set forth in paragraphs 1 through 62 with the same force and effect as if set forth at length herein.

64. WCT provided the SBI Guarantees to the Authorities in accordance with the Outsourcing Contracts and the Assignment and Consent Agreement, and with the expectation, and on the condition, that its affiliate, WCT India, would be assigned the Outsourcing Contracts.

65. The Outsourcing Contracts were never assigned to WCT India. Instead, almost immediately upon delivery of the SBI Guarantees to the Authorities, Defendants rejected the SBI Guarantees, terminated the Outsourcing Contracts on the ground that they were provided by a third party, and refused to approve the Assignment and Consent Agreement. Nevertheless, the Authorities retained the SBI Guarantees and control over the Collateral.

66. Thus, the Authorities presently are in possession of the SBI Guarantees and have control of the Collateral that was posted in connection with the SBI Guarantees and that belongs to WCT, which totals $3,970,304.00, despite rejecting the Outsourcing Contracts and specifically rejecting the submission of guarantees by a third party, and despite the fact that each one of the WCT Guarantees only guaranteed performance of specific obligations relating to the Outsourcing Contracts.

67. The Authorities have been unjustly enriched by maintaining the SBI Guarantees and refusing to return the Collateral to WCT.

68. If the Authorities are permitted to retain these funds, they will continue to be unjustly enriched as the direct and proximate result of their own wrongdoing.

69. The unjust enrichment was at the expense of the Plaintiff.

70. The circumstances are such that equity and good conscience require the Authorities to return the Collateral underlying the SBI Guarantees to the Plaintiff.

71. By reason of the foregoing, Plaintiff has been damaged and demands judgment directing the return of the SBI Guarantees and release of the Collateral in the amount of $3,970,304.00, as well as interest and costs.

## COUNT II
### (Conversion – Against the Authorities)

72. Plaintiff WCT repeats, reiterates, and realleges each and every allegation set forth in paragraphs 1 through 71 with the same force and effect as if set forth at length herein.

73. The Authorities have asserted intentional and complete dominion and control over Plaintiff WCT's property – the Collateral posted in support of the SBI Guarantees.

74. Plaintiff WCT provided the SBI Guarantees in accordance with the terms of the Outsourcing Contracts and the Assignment and Consent Agreement and for the sole purpose of supporting the Outsourcing Contracts.

75. Upon receipt of the SBI Guarantees, the Authorities terminated the Outsourcing Contracts because they were provided by a third party and therefore rejected the Assignment and Consent Agreement, but continued to control the Collateral.

76. These actions amount to conversion of WCT's property in violation of the laws of the State of New York.

77. As a result of the wrongful conversion of WCT's property, the Collateral underlying the SBI Guarantees, by the Authorities, Plaintiff has been damaged in the amount to be proven at trial that is at least $6,500,000, including the amount of the Collateral being improperly withheld/retained, the fees and costs incurred by Plaintiff in connection with securing and extending the SBI Guarantees, and the profits and opportunities that Plaintiff lost as a result of Defendants' wrongful conversion of Plaintiff's property.

## COUNT III
### (Money Had and Received – Against the Authorities)

78. Plaintiff WCT repeats, reiterates, and realleges each and every allegation set forth in paragraphs 1 through 77 with the same force and effect as if set forth at length herein.

79. The Authorities have received money belonging to WCT in the form of the Collateral supporting the SBI Guarantees, and have retained those amounts, which totals $3,970,304.00.

80. The Authorities have benefitted from their receipt of the Collateral.

81. In equity and good conscience, the Authorities should pay over these funds plus interest to WCT, the beneficial owner of these funds.

## COUNT IV
### (Constructive Trust – Against all Defendants)

82. Plaintiff WCT repeats, reiterates, and realleges each and every allegation set forth in paragraphs 1 through 81 with the same force and effect as if set forth at length herein.

83. The parties maintained a confidential or fiduciary relationship with respect to the SBI Guarantees and the Collateral.

84. The Defendants made express and implied promises in conjunction with the Outsourcing Contracts and the Assignment and Consent Agreement with respect to the purpose of the SBI Guarantees and how, if at all, they would be utilized by Defendants.

85. Plaintiff WCT posted Collateral supporting the SBI Guarantees in reliance on those promises and representations.

86. The Defendants have been unjustly enriched by refusing to return the SBI Guarantees and withholding the Collateral from the Plaintiff and also by indicating an intention to use the SBI Guarantees for reasons that would in any event be improper. A constructive trust is necessary to secure the SBI Guarantees and prevent further damage to the Plaintiff.

## COUNT V
## (TRO/ Preliminary Injunction
## – Against all Defendants and Nominal Defendant)

87. Plaintiff WCT repeats, reiterates, and realleges each and every allegation set forth in paragraphs 1 through 86 with the same force and effect as if set forth at length herein.

88. Defendants' refusal to return the SBI Guarantees or Collateral to Plaintiff WCT threatens to cause immediate, irreparable harm to the Plaintiff.

89. Irreparable harm to the Plaintiff would arise if the funds at issue in this case, which belong to Plaintiff could be used to satisfy obligations of parties other than Plaintiff, which parties are located overseas. Therefore, specific funds that belong to the Plaintiff could be transferred and removed from this jurisdiction. In addition, if Defendants were to draw upon the SBI Guarantees and take possession of the Collateral, such amounts would be exposed to claims of other creditors of Defendants. And because the SBI Guarantees and the collateral are the specific object of this action, and Plaintiff likely would not have the ability to recover these amounts from CKGS, if equitable relief is not granted, Plaintiff would not be in the same position as it is now if it prevails on its claim and Defendants are ordered to return the Collateral.

90. For the foregoing reasons, Plaintiff seeks a temporary restraining order and an order preliminarily enjoining the Defendants from drawing on the SBI Guarantees, or otherwise utilizing the Collateral and restraining and enjoining Nominal Defendant from honoring any request to draw on the SBI Guarantees or otherwise transferring the Collateral during the pendency of this action.

## CONCLUSION

WHEREFORE, Plaintiff WCT demands judgment:

(i) Compelling Defendants to return the SBI Guarantees to Plaintiff and release the Collateral to Plaintiff;

(ii) Awarding additional and/or consequential damages in an amount to be determined at trial that is no less than $2,600,000, along with prejudgment interest and costs;

(iii) Ordering that a constructive trust be imposed on the SBI Guarantees and Collateral;

(iv) Ordering that a temporary restraining order and a preliminary injunction be issued preventing Defendants from drawing on the SBI Guarantees, or otherwise utilizing the Collateral, and restraining and enjoining Nominal Defendant from honoring any request to draw on the SBI Guarantees or otherwise transferring the Collateral during the pendency of this action;

(v) Granting such other and further relief as may be just and proper.

Dated: New York, New York
July 26, 2022

Respectfully submitted:

**WHITE AND WILLIAMS LLP**

By: _____
Thomas E. Butler, Esq.
7 Times Square - Suite 2900
New York, NY 10036
Tel. (212) 714-3070
butlert@whiteandwilliams.com
*Counsel for Plaintiff*