UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WCT INC.,

               Plaintiff,

     v.

REPUBLIC OF INDIA, THE EMBASSY OF INDIA
WASHINGTON, D.C., AND MINISTRY OF
EXTERNAL AFFAIRS THROUGH THE EMBASSY OF
INDIA, WASHINGTON, D.C.

               Defendants.

STATE BANK OF INDIA,
NEW YORK BRANCH,

               Nominal Defendant.

No. 22-cv-6340

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

WHITE AND WILLIAMS LLP
7 Times Square, Suite 2900
New York, New York 10036-6524
(212) 714-3070
Attorneys for the Plaintiff

## **TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .........................................................................................................3

     A.     The Outsourcing Contracts. ...................................................................................3

     B.     The Assignment and Consent Agreement.............................................................5

     C.     The January 24 Letter. ..........................................................................................6

     D.     The Bank Guarantees. ...........................................................................................7

     E.     The Termination of the Outsourcing Contracts. ...................................................9

LEGAL STANDARD..............................................................................................................10

ARGUMENT ..........................................................................................................................10

I.      THE COURT HAS SUBJECT MATTER JURISDICTION UNDER THE FOREIGN
       SOVEREIGN IMMUNITIES ACT ...............................................................................10

II.    A TRO AND PRELIMINARY INJUNCTION MUST BE GRANTED IN ORDER TO
       PREVENT IMMEDIATE AND IRREPARABLE HARM TO THE PLAINTIFF..........12

III.   PLAINTIFF CAN DEMONSTRATE SERIOUS CLAIMS GOING TO THE MERITS
       AND A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS..........................17

     A.     Plaintiff will Prevail on its Unjust Enrichment Claim ..........................................18

     B.     This Case Warrants Imposition of a Constructive Trust........................................19

     C.     Plaintiff will Prevail on its Conversion Claim......................................................19

     D.     Plaintiff will Prevail on its Money Had and Received Claim................................20

IV.   THE BALANCING OF THE EQUITIES WARRANTS ISSUANCE OF
       THE TRO AND THE INJUNCTION................................................................................21

V.    WCT SHOULD NOT BE REQUIRED TO POST A BOND. .........................................21

VI.   CONCLUSION...............................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abdulla v. Embassy of Iraq*,
    2013 U.S. Dist. LEXIS 127914 (ED. Pa. Sep. 9, 2013) ........................................................11

*Aetna Health Inc. v. Rak*,
    2012 NY Misc. LEXIS 6768, NY Slip Op 33795(U)
    (Sup. Ct. NY County 2012) ...............................................................................................21

*AIM Int'l Trading LLC v. Valcucine SpA.*,
    188 F. Supp. 2d 384 (S.D.N.Y. 2002).................................................................................10

*Ally Bank v. Reimer*,
    Case No. CV-09-2795, 2010 U.S. Dist. LEXIS 7887, 2010 WL 446025
    (E.D.N.Y. Jan. 29, 2010) (WDW), adopted in its entirety, 2010 U.S. Dist
    LEXIS 163344 (E.D.N.Y. Mar. 12, 2010) ..........................................................................14

*Arrowhead Gen. Ins. Agency, Inc. v. Lincoln Gen. Ins. Co.*,
    Case No. 16-CV-1138, 2016 U.S. Dist. LEXIS 83492, 2016 WL 322959
    (M.D. Pa., June 28, 2016) ..................................................................................................16

*Brenntag Int'l Chems., Inc. v. Bank of India*,
    175 F.3d 245 (2d Cir. 1999).............................................................11, 12, 13, 15, 16

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010).................................................................................................17

*De Beers Consolidated Mines, Ltd. v. United States*,
    325 U.S. 212 (1945)...........................................................................................................13

*Deckert v. Independence Shares Corp.*,
    311 U.S. 282 (1945)...........................................................................................................13

*Doctor's Assocs., Inc. v. Stuart*,
    85 F.3d 975 (2d Cir. 1996).................................................................................................21

*Dong v. Miller*,
    No. 16-cv-5836, 2018 U.S. Dist. LEXIS 48506, 2018 WL 1445573
    (E.D.N.Y., Mar. 23, 2018) .................................................................................................14

*Drobbin v. Nicolet Instrument Corp.*,
    631 F.Supp. 860 (S.D.N.Y 1986) ......................................................................................16

*Ger-Nis, LLC v. FJB, Inc.*,
  No. 07-CIV-898, 2007 U.S. Dist. LEXIS 18493, 2007 WL 656851 (S.D.N.Y.
  Mar. 1, 2007)..........................................................................................................13

*Gluco Perfect LLC v. Perfect Gluco Prods*., No. 14-CV-1678
  2014 U.S. Dist. LEXIS 141966, 2014 WL 4966102 (E.D.N.Y. 2014) ...................19

*Goat Fashion Ltd*. V. 1661, Inc., No. 19-CV-11045, 2020 U.
  *S*. Dist. LEXIS 178636, 2020 WL 5758917 (S.D. N.Y. Sept. 28, 2020).................17

*Hamilton Watch Co. v. Benrus Watch Co*.,
  206 F.2d 738 (2d Cir. 1953).....................................................................................17

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc*.,
  596 F.2d 70 (2d Cir. 1979).......................................................................................17

*JP Morgan Chase Funding Inc. v. Hehman*,
  2019 N.Y. Slip Op 30543(U), (Sup. Ct. 2019) .......................................................18

*McCord v. Ally Fin., Inc.*,
  559 B.R. 41(Bankr. E.D.N.Y 2016)..........................................................................18

*Montanile v. Bd. Trs. Of Nat'l Elevator Indus. Health Benefit Plan*,
  577 U.S. 136 (2016)..................................................................................................13

*N.A.A.C.P., Inc. v. Town of East Haven*,
  70 F. 3d 219 (2d Cir. 1995)......................................................................................10

*Nordlicht v. N.Y. Tel. Co*.,
  799 F.2d 859 (2d Cir. 1986)......................................................................................20

*Republic of Philippines v. Marcos*,
  806 F.2d 344 (2d Cir. 1986).................................................................................13, 14

*Reuters Ltd. v. United Press Int'l, Inc*.,
  903 F.2d 904 (2d Cir. 1990)......................................................................................10

*Semmes Motors, Inc.*, *v. Ford Motor Co.*,
  429 F.2d at 1197 (2d Cir. 1970)................................................................................17

*Stillwater Liquidating LLC v. Net Five Palm Pointe, LLC (In re Stillwater Asset*
  *Backed Offshore Fund Ltd.)*,
  2018 U.S. Dist. LEXIS 54558 (S.D.N.Y. Mar. 30, 2018) ......................................19

*United Euram Corp. v. Union of Soviet Socialist Republics*,
  461 F. Supp. 609 (S.D.N.Y. 1978) ...........................................................................11

-iii-

*United States ex. El. Raham v. Oncology Assocs.*,
   198 F.3d 489 (4th Cir. 1999) ........................................................................14

*Wishnatzki & Nathel v. H.P. Island-Wide*,
   No. 00-civ-8051, 2000 U.S. Dist. LEXIS 15664, 2000 WL 1610790 (S.D.N.Y.
   Oct. 27, 2000) .........................................................................................13

## STATUTES

28 U.S.C.
   § 1602.........................................................................................................12
   § 1603.........................................................................................................11
   §§ 1605, 1605A, 1607.................................................................................11
   § 1605(a)(2) ...............................................................................................11

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 65 ...............................................................1, 10, 21

Federal Rule of Civil Procedure 65(c) ..................................................................21

Plaintiff WCT. Inc.  ("WCT" or "Plaintiff") by its attorneys, White and Williams LLP, respectfully submits the within memorandum of law in support of its motion (the "Motion"), brought by order to show cause ("OSC") for a temporary restraining order ("TRO") and a preliminary injunction ("Preliminary Injunction") pursuant to Federal Rule of Civil Procedure 65, restraining and enjoining Defendants the Republic of India ("India" or the "ROI"), the Embassy of India at Washington, D.C., (the "Embassy"), and Ministry of External Affairs through the Embassy of India (the "Ministry") (each, individually a "Defendant" and collectively the "Defendants"), from drawing on certain guarantees, and restraining and enjoining Nominal Defendant State Bank of India, New York Branch ("SBI" or "Nominal Defendant") from transferring certain funds in its possession belonging to Plaintiff. The Declaration of Sonia Boveja ("Boveja Dec.") and Declaration of Thomas E. Buter are filed in support of this Motion.

## PRELIMINARY STATEMENT

WCT brings this Motion for injunctive relief to prevent Defendants from drawing on certain guarantees provided to Defendants by Plaintiff, or transferring collateral posted in connection therewith (the "Collateral"). Plaintiff provided the guarantees to support the renewal of outsourcing contracts (the "Outsourcing Contracts") that the Ministry and the Embassy had entered into with M/s Cos & Kings Global Services PVT. Ltd., ("CKGS"), pursuant to which CKGS would provide certain services to Defendants.  CKGS sought to assign the Outsourcing Contracts to Plaintiff's affiliate, and WCT provided the guarantees in connection with that assignment.   Almost immediately after receiving the guarantees, however, Defendants declined to renew or extend the Outsourcing Contracts -- because the guarantees had been provided by a third-party -- and rejected the assignment. Inexplicably, however, Defendants have refused to return the guarantees or release the Collateral, indicating instead their intention to retain these

-1-

amounts to pay obligations of CKGS. By this action, WCT seeks to recover its Collateral, and also seeks other damages arising from Defendants' conduct.

Plaintiff unquestionably meets the standard for injunctive relief.  Plaintiff will suffer immediate and irreparable harm if Defendants can simply draw on the guarantees and take control of the disputed funds.  The guarantees and underlying Collateral are the principal object of this action, and Plaintiff has asserted claims for equitable relief with respect to the same.  Courts in this Circuit have repeatedly recognized that injunctive relief is appropriate to prevent steps to transfer or dissipate specific property or funds that are in dispute in a case.  This is hardly surprising. Indeed, if Defendants were permitted to draw on the guarantees, that would allow them to use the Collateral to satisfy other obligations, transfer the Collateral to their accounts outside of the country, expose the amounts at issue to their other creditors, and thwart Plaintiff's ability to litigate the issues in this Court, instead of in India, thereby mooting Plaintiff's principal request for relief. Moreover, the financial problems with CKGS make it unlikely that Plaintiff could ever recover anything from CKGS.

Plaintiff can also prove likelihood of success on the merits or at least serious questions going to the merits.  This is a classic case of unjust enrichment, given Defendants' refusal to return WCT's property, despite having rejected the guarantees themselves, rejected the assignment and declined to continue with the Outsourcing Contracts, and therefore provided no consideration to Plaintiff for the Collateral that Defendants retain and threaten to dissipate. Plaintiff can also demonstrate that a constructive trust is properly imposed on the funds that Plaintiff has provided and that are being held by Defendants, but are in dispute.  Plaintiff likewise has strong claims sounding in conversion and money had and received.

Finally, the balance of the equities also clearly weighs heavily in favor of Plaintiff. Defendants -- foreign sovereigns -- can make no showing that they will suffer any harm or prejudice if they are enjoined from drawing on the guarantees during the pendency of this action, while, if injunctive relief is not granted, the very assets at issue in this case could be removed from the jurisdiction, and Plaintiff could lose its ability to ever be made whole. This Court should maintain the *status quo* during the pendency of this litigation.

For all of these reasons, Plaintiff respectfully requests that the Court enter an order: (i) restraining and enjoining Defendants from drawing on the guarantees, or otherwise utilizing the Collateral; and (ii) restraining and enjoining the Nominal Defendant from entertaining any request to draw on the guarantees or otherwise transferring the Collateral during the pendency of this action.

## STATEMENT OF FACTS

### A.    The Outsourcing Contracts.

The Embassy and Ministry (collectively, the "Authorities") entered into various contracts to outsource services related to the issuance and operation of Visas, Overseas Citizenship of India Cards, Person of Indian Origin Cards, Renunciation and Surrender of Indian Nationality and Citizenship, and other Certificate Support Services (collectively the "Outsourcing Services"). (Boveja Dec. ¶ 5).

On April 29, 2014, the Embassy and CKGS entered into an agreement pursuant to which CKGS was to act as a service provider to the Embassy and the Ministry (the "Initial Outsourcing Contract"). *Id*. The term of the Initial Outsourcing Contract commenced on May 21, 2014, and was to end on May 20, 2018, but was subsequently extended through a series of extension

agreements (collectively "Extension Agreements"). *Id*. at ¶ 6.   The Extension Agreements

expressly required CKGS to arrange for the provision of bank guarantees:

> submitting fresh Bank Guarantees (BGs) valid from 1st January
> 2020 until 30th June 2022, within one month of signing of this
> Extension Agreement on the basis of number of services in the last
> 3 years (2017-2019), failing which the Ministry shall have the right
> to terminate the Agreement so extended and CKGS shall be liable
> for all the consequences arising therefore…..

*Id*. at ¶ 7.

The Authorities entered into a second contract to outsource certain services related to

passports (collectively the "Passport Services"). *Id*. at ¶ 8. On April 19, 2016, the second

outsourcing contract between the Embassy and CKGS was executed (the "Passport Contract" and

the Initial Outsourcing Contract, collectively "Outsourcing Contracts"). *Id*. The term of the

Passport Contract commenced on April 19, 2016 and was to end on May 6, 2018 but was

subsequently extended through a series of extension agreements (collectively "Passport Extension

Agreements"). *Id*. at ¶ 9.   The Passport Extension Agreements also expressly required CKGS to

arrange for the provision of bank guarantees:

> submitting fresh Bank Guarantees (BGs) valid from 1st January
> 2020 until 30th June 2022, within one month of signing of this
> Extension Agreement on the basis of number of services in the last
> 3 years (2017-2019), failing which the Ministry shall have the right
> to terminate the Agreement so extended and CKGS shall be liable
> for all the consequences arising therefore…..

*Id*. at ¶ 10.

While CKGS had previously arranged for bank guarantees in accordance with the terms of

the Outsourcing Contracts, in accordance with the Extension Agreements and the Passport

Extension Agreements, CKGS was obligated to provide "fresh bank guarantees" that would be

valid until June 30, 2022. *Id*. at ¶¶ 6 and 9.

-4-

At the time when the Outsourcing Contracts were up for renewal in 2018, CKGS apparently was facing financial hardship that prevented it from further extending the Outsourcing Contracts due in part to its inability to provide fresh bank guarantees. *Id*. at ¶ 12.   CKGS informed WCT that the Authorities had been made aware of the aforementioned financial hardship, and understood that an investor or third party would need to become involved to help resolve the situation. *Id*.

**B.     The Assignment and Consent Agreement.**

In late 2019, CKGS approached Plaintiff and its affiliate, World Compliance Technologies Pvt. Ltd. ("WCT India"), seeking financial and operational support for the Outsourcing Contracts. *Id*. at ¶ 13.  This included a request for assistance with furnishing a series of bank guarantees to support the renewal requirements. *Id*.  Thereafter, in January 2020, CKGS executed an assignment and consent agreement ("Assignment and Consent Agreement") with WCT India. *Id*. at ¶ 15. The Assignment and Consent Agreement outlined the terms and timeline for the Outsourcing Contracts to be fully transferred and assigned to WCT India. *Id*.  At that time, CKGS represented to WCT India that the Authorities had consented to the assignment. In exchange for the assignment by CKGS of the Outsourcing Contracts to WCT India, among other things, WCT India would pay a monthly fee to CKGS, and arrange for the needed bank guarantees to be issued on behalf of CKGS. *Id*. at ¶ 16.

The validity of the Assignment and Consent Agreement was contingent upon the Authorities approving the assignment of the Outsourcing Contracts by or before the pre-closing date set forth therein (the "Pre-Closing Date"). *Id*. at ¶ 18.  As set forth in section 7.1 and section 7.2 of the Assignment and Consent Agreement:

> 7.1 Pre-Closing Date shall be on or before the expiration of this Agreement by which time CKGS shall obtain in principle written approval of the Processing Agreements and Processing Services in

favour of WCT from the Authorities. **Simultaneously, with such being provided by CKGS to WCT, WCT shall deliver the Bank Guarantee(s) as detailed in Exhibit 3 to the Authorities.**

7.2 Closing shall occur 10 (ten) business days after all deliverables under this Agreement are delivered and accepted by WCT and the satisfactory complete Assignment of the Processing Agreements and the relevant Authorities accepting the Bank Guarantee provide by WCT. During the period until Closing date CKGS undertakes full responsibility to successfully run Processing Services as required under the Processing Agreements including making payments when they come due in the ordinary course of business to Vendors and all employees.

*Id*. at ¶ 19.

Upon approval of the assignment of the Outsourcing Contracts to WCT India by the Authorities, the bank guarantees would be provided to the Authorities by WCT. *Id*. at ¶ 20. The bank guarantees likewise would only be valid if the Outsourcing Contracts were assigned to WCT India; otherwise, the bank guarantees would be rendered null and void. *Id*. at ¶ 21. Section 2.3 of the Assignment and Consent Agreement expressly stated that:

If for whatever reason, if any act, action, claim, dispute, difference, liability, etc. from a court of law or a third party or a claim of any nature whatsoever that may arise on account of any misrepresentation and/or non-disclosure by the CKGS Companies or for any reason whatsoever (other than non-performance by WCT) result in **premature termination of the Processing Agreements, the Bank guarantee provided to the Authorities will be null and void**.

*Id*. at ¶ 22.

**C.    The January 24 Letter.**

A few days after the execution of the Assignment and Consent Agreement, CKGS sent a letter to the Ministry that memorialized the discussions that CKGS purportedly had with the Authorities with regards to the assignment of the Outsourcing Contracts (the "January 24 Letter").

*Id*. at ¶ 24.  On or about January 24, 2020, the Ministry acknowledged receipt of the January 24

Letter. The January 24 Letter memorialized the following terms:

> We Cox and Kings Global Services here states that our Bank Guarantee for all the mission has been arranged and we have got the investor who will be helping us in terms of Finance and operations for all the Mission projects.
>
> Addition to this Bank is asking for Assignment approval as per the Clause 10 (Page No. 15 and 16) of the Master service agreement.
>
> Our new Investor partner is World Compliance Technology (WCT), WCT Pvt Ltd., a company incorporated in India with its registered address at 1027-1030 Tower B3, Spaze i-Tech park, Sector 49, Sohna Road, Gurgaon, India.
>
> WCT will be furnishing the BG on behalf of CKGS and will be supporting us in running the operation for a period of 2 (TWO) years effective from 1st Jan, 2020 till 31st Dec, 2021.
>
> Hence request you to please grant your consent to allow WCT to furnish the BG on our behalf and partner us in running the operation.
>
> CKGS will be full responsible for adhering to RFP terms and clauses. There will be no deviation in any of the compliance and process.

*Id*. at ¶ 25.  However, unbeknownst to WCT India, the Authorities had outright rejected the order

of WCT India providing said services or the guarantees.

The parties agreed that the requisite bank guarantees would be provided by WCT in

accordance with the terms of the Outsourcing Contracts and the Assignment and Consent

Agreement, solely for purposes of supporting the Outsourcing Contracts. *Id*. at ¶ 26.

### D.    The Bank Guarantees.

In accordance with the Outsourcing Contracts and the Assignment and Consent

Agreement, WCT, at the behest of its affiliate, WCT India, arranged for the requisite bank

guarantees to be issued on February 28, 2020 and March 10, 2020. *Id*. at ¶ 27.

WCT provided the financing and Collateral and arranged for four bank guarantees (collectively the "WCT Guarantees") to be issued in conjunction with the Outsourcing Contract, Assignment and Consent Agreement, and the Letter Agreement as follows:

| Bank Guarantee | Date Issued | Amount | Bank |
|---|---|---|---|
| 1 | March 10, 2020 | $443,304 | SBI |
| 2 | March 10, 2020 | $774,304 | SBI |
| 3 | March 10, 2020 | $2,751,467 | SBI |
| 4 | February 28, 2020 | $565,000 | ICICI Bank |
| Total: | | $4,534,075 | |

*Id*. at ¶ 28.   The amounts of each of the separate WCT Guarantees were determined by the Authorities and reflected the services that were provided by CKGS to the Embassy during the preceding three years from 2017 to 2019. *Id*. at ¶ 29.   Three of the bank guarantees were issued by SBI and are directly at issue in this action (individually "SBI Guarantee" and collectively the "SBI Guarantees"). Id. at ¶ 30.   The SBI Bank Guarantees totaled $3,970,304.00. *Id.*

By its express terms, each of the WCT Guarantees guaranteed performance of specific obligations relating to the Outsourcing Contracts. The $443,304 SBI Guarantee guaranteed "the government funds collected and held…temporarily and for the safety of documents."  Id., Ex. G. The $774,304 SBI Guarantee guaranteed payment of penalties associated with non-compliance with service standards as per the Outsourcing Contracts. Id.   The $2,751,467 SBI Guarantee and $565,000 guarantee with ICICI Bank guaranteed payments of those amounts in the event that the contractor terminated the Outsourcing Contracts without providing the contractually mandated six-month notice. Id.   The Authorities otherwise had no right to draw upon these guarantees.

-8-

After WCT arranged for the Collateral to secure and fund the SBI Guarantees, the SBI Guarantees were issued. *Id.* SBI directly sent the SBI Guarantees to the Embassy. *Id.* at ¶___.

**E.      The Termination of the Outsourcing Contracts.**

Unbeknownst to WCT, on January 29, 2022, the Ministry wrote a letter to CKGS raising concerns about the submission of guarantees from a third party, as well as the assignment of the Outsourcing Contracts. *Id.* at ¶ 36. Through a series of letters dated March 5, 2020 through March 18, 2020, the Ministry further informed CKGS that it would not go forward with the Outsourcing Contracts because the bank guarantees were being provided by WCT. Thus, upon their receipt of the SBI Guarantees, the Authorities almost immediately chose to terminate/non-renew the Outsourcing Contracts with CKGS. *Id.* at ¶ 37. The basis for the Authorities' non-renewal was their specific *rejection* of the WCT Guarantees and refusal to allow submission of third-party guarantees. Therefore, after securing the WCT Guarantees, the Authorities proceeded not only to terminate the Outsourcing Contracts, but also effectively to extinguish the Assignment and Consent Agreement. *Id.* at ¶ 38. Upon termination/non-renewal of the Outsourcing Contracts, the Assignment and Consent Agreement became null and void by its terms. Likewise, the SBI Guarantees also became null and void. *Id.* at ¶ 21.

Even though the Authorities terminated and refused to renew the Outsourcing Contracts with CKGS because of the guarantees were submitted by a third party, they have refused to return the SBI Guarantees to WCT or to release its Collateral. *Id.* at ¶ 39. The Defendants have indicated that an audit of CKGS's past performance revealed that several million dollars are owed by CKGS to Defendants. *Id.* at ¶ 40. Defendants have also indicated that they may use the Collateral to pay certain of these amounts. This is despite the fact that 1) the Authorities specifically rejected the WCT Guarantees and declined to continue the Outsourcing Contracts or accept the Assignment

and Consent Agreement; and 2) each of the WCT Guarantees expressly guaranteed only specific aspects of performance under the Outsourcing Contracts. Under no circumstance would Defendants have had the right to use the SBI Guarantees to satisfy other obligations.

As a result of Defendants' conduct, WCT continues to be deprived of access to the Collateral and also has incurred significant costs related to the issuance of the SBI Guarantees and to keep the SBI Guarantees in good standing, as well as suffering additional damages.

## LEGAL STANDARD

The standards for granting a temporary restraining order and a preliminary injunction are well known, and identical under the Fed. R. Civ. P. 65. "A party must demonstrate '(1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief." *N.A.A.C.P., Inc. v. Town of East Haven*, 70 F. 3d 219, 223 (2d Cir. 1995); *AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 386 (S.D.N.Y. 2002).   As addressed below, Plaintiff meets all three prongs of this test. "Whether injunctive relief should issue or not 'rests in the sound discretion of the district court which, absent abuse of discretion, will not be disturbed on appeal." *Id*. (*quoting Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)).

## ARGUMENT

## I.   THE COURT HAS SUBJECT MATTER JURISDICTION UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT

As a threshold matter, the Court has subject matter jurisdiction over this action pursuant to the commercial activity exception of the Foreign Sovereign Immunities Act (the "FSIA"). While the FSIA provides that foreign states and their instrumentalities may be immune from suit, there

are several statutory exceptions that grant jurisdiction to federal courts. *See* 28 U.S.C. §§ 1605, 1605A, 1607.  The "commercial activity" exception is one of those exceptions, and applicable to the facts of this case. *See Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) (holding that foreign sovereign immunity "does not extend to cases arising out of [ ] strictly commercial acts" and that FSIA does not prohibit injunctions against a foreign sovereign); *see also Abdulla v. Embassy of Iraq*, 2013 U.S. Dist. LEXIS 127914 (ED. Pa. Sep. 9, 2013) (holding the commercial activity exception applied and the Iraqi government and embassy were not immune from suit).

Section 1603(d) defines "commercial activity" and specifies that "the commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603. Courts have held that contracts entered into by foreign sovereigns shall be considered commercial contracts even where the ultimate purpose might be a public function. S*ee United Euram Corp. v. Union of Soviet Socialist Republics*, 461 F. Supp. 609 (S.D.N.Y. 1978) (denying motion to dismiss and holding that the contract at issue "was a sale of a service and therefore commercial activity within the meaning of the Act, which provided that an activity's purpose was irrelevant to determining its commercial character"). The FSIA's "commercial activity" exception denies immunity to a foreign state where an action is "based upon" any of the following: (i) "a commercial activity carried on in the United States by the foreign state"; (ii) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (iii) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

-11-

Defendants are not immune from suit, given that this action is premised upon their commercial activity in the United States and their acts in furtherance thereof. The nature and the course of the Defendants' conduct in entering into the agreements at issue in this action fall within the confines of the statutorily defined "commercial activity" of section 1603(d). Indeed, Defendants entered into several contracts or other business arrangements in connection with their commercial activity – seeking to obtain outsourced services in the United States. Specifically, the Defendants entered into the Outsourcing Contracts with CKGS.  The Defendants also rejected the SBI Guarantees provided by WCT in accordance with those agreements, and now refuse to return those SBI Guarantees. This is precisely the type of activity that falls within the commercial activity exception of the FSIA.

Finally, the Court's jurisdiction under the FSIA extends to granting a temporary restraining order, and a preliminary injunction can be issued against foreign sovereigns. *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) (citing 28 U.S.C. § 1602).

## II.   A TRO AND PRELIMINARY INJUNCTION MUST BE GRANTED IN ORDER TO PREVENT IMMEDIATE AND IRREPARABLE HARM TO THE PLAINTIFF

Plaintiff will suffer irreparable harm absent an injunction.  Without an order freezing the disputed funds, the Defendants will be able draw upon the SBI Guarantees as they have already said they will do, and dissipate the Collateral to any number of bank accounts located in India or throughout the world.  If that happens, Plaintiff will be deprived of the very Collateral it seeks to recover in this action under the equitable theories of unjust enrichment and constructive trust.  Such potential harm to Plaintiff easily satisfies the irreparable harm requirement for granting a preliminary injunction.

-12-

Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). Courts have repeatedly held that a party shows irreparable harm when it claims title to specific funds and shows that, absent an injunction, the funds are at risk of dissipation. *Wishnatzki & Nathel v. H.P. Island-Wide*, No. 00-civ-8051 (JSM), 2000 U.S. Dist. LEXIS 15664 at *4-5, 2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000). The "risk that defendant will have dissipated the [funds] without paying the plaintiff, leaving the plaintiff out of luck and money," is sufficient risk of irreparable harm to justify an injunction. *Ger-Nis, LLC v. FJB, Inc.*, No. 07-CIV-898 (RCC), 2007 U.S. Dist. LEXIS 18493 at *4-5, 2007 WL 656851 (S.D.N.Y. Mar. 1, 2007) (citation omitted).

As Judge Martin stated in *Wishnatzi*: "where the particular funds sought to be frozen are also the funds at issue in the suit, a preliminary injunction is proper." *Wishnatzki,* U.S. Dist. LEXIS 15664 at *4. This is so because dissipation of the subject funds would wholly defeat the equitable claims to the funds, and any demand that the particular funds be returned. *cf. Montanile v. Bd. Trs. Of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 145-46 (2016) (where a plaintiff claims an equitable entitlement to specific funds, dissipation of those funds generally defeats the equitable claim). Indeed, the Supreme Court has stated that "[a] preliminary injunction *is always appropriate* to grant intermediate relief of the same character as that which may be granted finally." *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945) (emphasis added); *see also, Republic of Philippines v. Marcos,* 806 F.2d 344, 356 (2d Cir. 1986) (same); *see also Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1945) (affirming the grant of a preliminary injunction prohibiting disposition of funds where action sought recovery of funds).

Accordingly, courts have consistently recognized that irreparable harm will lie where "the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets." *United States ex. El. Raham v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999).  All that must be shown is a nexus between the assets sought to be frozen and the equitable relief requested in the lawsuit.  *See Dong v. Miller*, No. 16-cv-5836, 2018 U.S. Dist. LEXIS 48506 at *25, 2018 WL 1445573 (E.D.N.Y., Mar. 23, 2018) ("[W]here plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets," but the movant must "demonstrate a nexus between the injunctive relief requested and the equitable relief ultimately sought.") (citations and internal quotations marks omitted); *Ally Bank v. Reimer*, Case No. CV-09-2795 (ADS) (WDW), 2010 U.S. Dist. LEXIS 7887 at 13-14, 2010 WL 446025 (E.D.N.Y. Jan. 29, 2010) (WDW), *adopted in its entirety*, 2010 U.S. Dist LEXIS 163344 (E.D.N.Y. Mar. 12, 2010) (ADS) (preliminary injunctive relief available to restrain transfers of property that are the subject of litigation).

Thus, in *Republic of Philippines v. Marcos,* the Second Circuit affirmed the granting of a preliminary injunction to prevent a real estate company from transferring certain real estate of which the Philippines had claimed to be the beneficial owner. In affirming the decision, the Circuit Court explained that the injunction was appropriate to prevent transferring the properties to another jurisdiction, which might make collection and recovery more difficult, because ownership of the properties was directly at issue in the suit. *Republic of Philippines,* 806 F.2d at 356.  Similarly, in *Dong*, the court granted a preliminary injunction preventing the transfer of property in which the plaintiff established an equitable lien.  *Dong,* 2018 U.S. Dist. LEXIS at *25.  And in *Ally Bank*, the court granted an injunction to prevent the further transfer of property that was the subject of a fraudulent conveyance action.  *Ally*, 2010 U.S. Dist. LEXIS 7887 at *13-14.

-14-

Here, there is a strong nexus between the assets sought to be frozen and the actual claims because the claims in this case principally center on returning the specific assets, *i.e.* the Collateral underlying the SBI Guarantees.  Plaintiff seeks, among other things, a judgment that Defendants have been unjustly enriched and therefore should be required to return the SBI Guarantees and to release the Collateral, and the imposition of a constructive trust on the Collateral.  This Motion, in turn, seeks to prevent Defendants from drawing on the SBI Guarantees, which would allow them to take control of the Collateral, to use it to pay other debts, to transfer it abroad, or otherwise dissipate it while the litigation is pending, thereby potentially thwarting or rendering moot, the relief Plaintiff seeks.   Injunctive relief is entirely appropriate to prevent this from happening during the pendency of an action that seeks to determine whether Plaintiff is entitled to have the Collateral back.

Moreover, courts have addressed a similar scenario as presented by the facts of this case – where a party seeks to draw on a guarantee or letter of credit after a contract is terminated and a business dispute arises related thereto – and determined that injunctive relief was warranted to prevent irreparable harm. *Brenntag*, 175 F.3d at 250. In *Brenntag* the plaintiff executed a contract with the non-party Petro Pharma PTE, Ltd., ("Petro") to purchase product that was being shipped to another third party. *Id.* at 248-249. To secure payment under the contract to Petro, the plaintiff obtained a stand-by letter of credit from Norddeutsche Landesbank GZ ("NDL"), which could only be drawn if plaintiff failed to pay for the goods it contracted to purchase pursuant to the contract with Petro. *Id*. In the interim, Petro obtained a loan from the Bank of India ("BOI") based upon the expected sale of goods to the plaintiff. *Id.* Petro defaulted on its contract with plaintiff, never delivered the goods to plaintiff, and the contract was cancelled as a result. *Id.*  Petro then defaulted on its loan to BOI and eventually became insolvent. *Id.*  BOI subsequently attempted to collect

under the NDL letter of credit. *Id*. Petro advised BOI that collection under the NDL letter of credit would be improper because it had never delivered the goods to plaintiff, and the contract had been cancelled. *Id*.  The plaintiff subsequently brought suit against NDL and BOI, to enjoin NDL from paying under the letter of credit, and to further enjoin any collection attempts under the letter of credit. *Id*. The Court found, particularly in light of Petro's insolvency, that if defendant drew on the letter of credit, plaintiff would not be in the same position at the end of the case as it was at its outset, which would constitute "irreparable harm." *Id*.

  For the same reasons, an injunction is warranted in this case to prevent the irreparable harm that WCT will suffer if Defendants draw on the SBI Guarantees or transfer the Collateral. The Defendants have indicated that they are retaining the SBI Guarantees because an audit purportedly uncovered substantial amounts owed to Defendants by CKGS, and Defendants intend to utilize those funds to pay down that debt.  If Defendants are not enjoined, Plaintiff will face the same sort of harm faced by plaintiff in *Brenntag*.  The funds at issue could potentially be removed from the jurisdiction and certainly will be exposed to other creditors of Defendants.  Plaintiff may be forced to seek to litigate, or to seek to enforce any judgment it obtains, in India—where Defendants are sovereigns and would have an inherent advantage – as opposed to in New York, where Plaintiff obtained the Guarantees and in the first place, and where the Collateral is held.  And as was true in *Brenntag*, the other potential source of recovery here, CKGS, is apparently insolvent, and Plaintiff likely has no viable remedy against it.   *See e.g., Drobbin v. Nicolet Instrument Corp.,* 631 F.Supp. 860, 912 (S.D.N.Y 1986) (holding that irreparable injury may be found where insolvency threatens to frustrate any future damages award); *Arrowhead Gen. Ins. Agency, Inc. v. Lincoln Gen. Ins. Co*., Case No. 16-CV-1138, 2016 U.S. Dist. LEXIS 83492 at *17, 2016 WL

322959 (M.D. Pa., June 28, 2016) (holding irreparable harm existed where plaintiff would be unable to recover if letter of credit was drawn upon).

### III.  PLAINTIFF CAN DEMONSTRATE SERIOUS CLAIMS GOING TO The MERITS AND A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

The next prong of the analysis is a showing of the "likelihood of success on the merits," or "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir. 2010) (*quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc*., 596 F.2d 70, 72 (2d Cir. 1979)); *see Hamilton Watch Co. v. Benrus Watch Co*., 206 F.2d 738, 740 (2d Cir. 1953); *see also Semmes Motors, Inc.*, *v. Ford Motor Co.,* 429 F.2d 1197, 1205-06 (2d Cir. 1970).  As discussed more fully below and as evidenced by the supporting documents, WCT more than amply satisfies this prong. Here, WCT certainly has demonstrated serious questions going to the merits of the action, as well as a likelihood of success on the merits, warranting the issuance of an injunction.

> To establish a likelihood of success on the merits, a plaintiff need not show that success is an absolute certainty. It need only make a showing that the probability of their prevailing is better than fifty percent. The serious questions standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction.

*Goat Fashion Ltd.*, 2020 WL 5758917, at *17 (citations omitted) (Granting preliminary injunction given the probability of success and to prevent irreparable harm to plaintiff); *Semmes Motors, Inc.*, 429 F.2d at 1206 (Court held in light of the hardship and probability of losing an entire business, it was unnecessary to require a showing of a "likelihood of success" as the franchisee raised questions "going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation")(*quoting Hamilton Watch Co.,* 206 F.2d at 740)).

-17-

WCT has set forth four claims in its Complaint against the Defendants, each of which will likely succeed on the merits: Unjust Enrichment, Constructive Trust, Conversion, and Money Had and Received.

### A.  Plaintiff will Prevail on its Unjust Enrichment Claim

There is a high likelihood of success on the merits with regard to the Plaintiff's unjust enrichment claim. To prevail on a claim for unjust enrichment under New York law, a plaintiff must show three elements: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *McCord v. Ally Fin., Inc.,* 559 B.R. 41(Bankr. E.D.N.Y 2016). "An unjust enrichment claim is rooted in the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Id.*; *JP Morgan Chase Funding Inc. v. Hehman*, 2019 N.Y. Slip Op 30543(U), (Sup. Ct. 2019) (holding unjust enrichment and breach of implied contract claims had been established).

This case presents the quintessential example of unjust enrichment, and each legal element can be conclusively established. The Authorities received the SBI Guarantees and the Collateral, which were provided solely to support the continuation of the Outsourcing Contracts. Each of the SBI Guarantees, by its terms, guaranteed specific aspects of the contractor's performance, and therefore, in any case, the Authorities were only entitled to draw on each of the SBI Guarantees if particular breaches occurred. The Authorities then rejected the SBI Guarantees and terminated the Outsourcing Contracts -- because the guarantees were provided by a third party -- and rejected the Assignment and Consent Agreement. Nevertheless, the Authorities retained control of the SBI Guarantees and the Collateral and have expressed their intention to use the SBI Guarantees to satisfy other obligations of *CKGS* – not obligations of WCT, and not to address the specific

breaches for which they were provided.    Equity and good conscience certainly require that Defendants, which have provided absolutely no consideration or value whatsoever to Plaintiff, and thus were "unjustly enriched" at Plaintiff's expense, relinquish and return the Collateral.

**B.      This Case Warrants Imposition of a Constructive Trust.**

The imposition of a constructive trust under New York law generally requires the following elements to be shown: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject res made in reliance on that promise; and (4) unjust enrichment. *See Stillwater Liquidating LLC v. Net Five Palm Pointe, LLC (In re Stillwater Asset Backed Offshore Fund Ltd.)*, 2018 U.S. Dist. LEXIS 54558 (S.D.N.Y. Mar. 30, 2018).

Here, the parties certainly maintained a confidential relationship with respect to the SBI Guarantees and the Collateral. The Defendants made express and implied promises in conjunction with the Outsourcing Contract and the Assignment and Consent Agreement with respect to the purpose of the SBI Guarantees, and certainly an implied promise that the SBI Guarantees would be used solely to support the Outsourcing Contracts, and to  address  specific breaches of the same, and for no other purposes.  WCT posted its Collateral supporting the SBI Guarantees in reliance on those promises and representations, and with the expectation their terms would be honored. The Authorities have been unjustly enriched by refusing to return the SBI Guarantees and withholding the Collateral from the Plaintiff. A constructive trust is entirely appropriate to secure the SBI Guarantees and the Collateral.

**C.      Plaintiff will Prevail on its Conversion Claim.**

Similarly, there is a high likelihood of success on the conversion claim. "A claim of conversion under New York law is defined as 'the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Gluco*

*Perfect LLC v. Perfect Gluco Prods*., 2014 WL 4966102, *65-66 (E.D.N.Y. 2014) (holding that plaintiffs are likely to succeed on their claim of conversion and a TRO is appropriate).

The Authorities have asserted intentional and complete dominion and control over WCT's property – the Collateral posted in support of the SBI Guarantees. Despite their decision to terminate the Outsourcing Contracts because guarantees were provided by a third party and to reject the SBI Guarantees and the Assignment and Consent Agreement, the Authorities have refused to return the SBI Guarantees or release the Collateral. Their continued assertion of control over Plaintiff's property amounts to conversion of this property, for which Plaintiff is entitled to relief.

### D.     Plaintiff will Prevail on its Money Had and Received Claim.

The claim for money had and received likewise has a high probability of success. The Authorities are in possession of $3,970,304.00 by way of the Collateral that funded the SBI Guarantees that they refuse to return to WCT. The essential elements of a claim for money had and received are that (1) defendant received money belonging to plaintiff, (2) defendant benefited from the receipt of money, and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money. *Nordlicht v. N.Y. Tel. Co*., 799 F.2d 859, 865 (2d Cir. 1986) (internal quotations omitted). The undisputed facts demonstrate that the Authorities received the SBI Guarantees that belong to the Plaintiff and that the Defendants have benefited from the receipt of those SBI Guarantees. The Authorities should not be permitted to keep the SBI Guarantees under the principles of equity and good conscience. The facts of this case demonstrate a high likelihood of success with regards to Plaintiff's money had and received cause of action.

## IV.     THE BALANCING OF THE EQUITIES WARRANTS ISSUANCE OF THE TRO AND INJUNCTION.

The balancing of the equities in this case tips heavily in favor of the Plaintiff.  In the absence of an injunction, Plaintiff will suffer significant and irreparable harm.  Not only will Plaintiff be deprived access to Collateral that belongs to Plaintiff, but also faces the prospect of never being able to obtain compensation for the harm caused to it, given the possibility that amounts at issue will be removed from the jurisdiction, and Plaintiff may have to seek recovery in India – where it would be contesting this issue with a sovereign defendant -- as well as its inability bring claims against CKGS.  By contrast, Defendants will be completely unaffected by the granting of the TRO or the Preliminary Injunction. The grant of injunctive relief will not impose any hardship whatsoever on Defendants, and will not impact the manner in which this case is litigated, and should they prevail in the litigation, the funds will still be available to them.  *See e.g. Aetna Health Inc. v. Rak*, 2012 NY Misc. LEXIS 6768, 2012 NY Slip Op 33795(U) (Sup. Ct N.Y. County 2012). Enjoining the Defendants from drawing on the SBI Guarantees will maintain the *status quo* of this action and protect the interests of all parties.

## V.     WCT SHOULD NOT BE REQUIRED TO POST A BOND.

Federal Rule of Civil Procedure 65(c) generally requires a party that secures a temporary restraining order and preliminary injunction to post security in the form of a bond "in an amount that the court considers proper" to pay for the costs and damages that may be incurred by a wrongfully restrained party.  A district court, however, has wide discretion in setting the amount of a bond and can dispense entirely with the security requirement when there has been no showing of likelihood of harm to the enjoined party.  *Doctor's Assocs., Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir. 1996) (Affirming district court's refusal to require a bond where defendants "have not shown

-21-

that they will suffer harm absent the posting of a bond").

The Defendants in this action will suffer no harm from the TRO or Preliminary Injunction and therefore no bond is necessary. Once again, if the Preliminary Injunction is granted, the *status quo* will be maintained and the SBI Guarantees and Collateral will remain in place until there is a resolution of the claims herein. Accordingly, WCT should not be required to post a bond.

## VI.     CONCLUSION

For the reason set forth above, the TRO and Preliminary Injunction should be granted.

Dated:   New York, New York
            July 26, 2022

Respectfully submitted:

**WHITE AND WILLIAMS LLP**

By: _____
Thomas E. Butler, Esq.
7 Times Square - Suite 2900
New York, NY 10036
Tel. (212) 714-3070
butlert@whiteandwilliams.com
*Counsel for Plaintiff*

-22-